IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Kendra Ruby on behalf of MKR,    :
            Plaintiff    :    Civil Action 2:13-cv-01254

      v.    :    Judge Marbley

Carolyn W. Colvin,    :    Magistrate Judge Abel
Commissioner of Social Security,
            Defendant    :

**REPORT AND RECOMMENDATION**

    Plaintiff Kendra Ruby, on behalf of MKR, brings this action under 42 U.S.C. §§405(g) for review of a final decision of the Commissioner of Social Security denying her application for Supplemental Security Income benefits. This matter is before the Magistrate Judge for a report and recommendation on the parties' cross-motions for summary judgment.

    **<u>Summary of Issues.</u>** M.K.R., a minor child, was born October 13, 2005. Plaintiff, through her mother, believes she is disabled due to attention deficit/hyperactivity disorder (ADHD), oppositional defiant disorder (ODD), asthma, sleep apnea and obesity.

    Plaintiff argues that the decision of the Commissioner denying benefits should be reversed because:

- The administrative law judge violated SSR 96-2p and 20 C.F.R. § 404.1527 when evaluating Dr. Merzweiler's opinion;
- The administrative law judge violated SSR 96-6p;
- The administrative law judge failed to rule on plaintiff's requests for a medical expert; and,

- The administrative law judge failed to properly evaluate the childhood disability Listings.

**Procedural History.**  Plaintiff MKR filed her application for disability insurance benefits on October 12, 2010, alleging that she became disabled on January 1, 2006, at age 2½ months, by chronic asthma.  (R. 165, 185.)  The application was denied initially and upon reconsideration.  Plaintiff sought a *de novo* hearing before an administrative law judge.  On December 20, 2011, February 21, 2012, and August 2, 2012, an administrative law judge held hearings. The hearings were continued until plaintiff obtained counsel. M.K.R.'s mother, represented by counsel, appeared and testified.  (R. 56, 63, 74.) On September 12, 2012, the administrative law judge issued a decision finding that M.K.R. was not disabled within the meaning of the Act.  (R. 34.)  On November 14, 2013, the Appeals Council denied plaintiff's request for review and adopted the administrative law judge's decision as the final decision of the Commissioner of Social Security.  (R. 1-4.)

**Age and Education.**  M.K.R. was born October 13, 2005. (R. 165.) She attended a Head Start program for preschool. At the time of the last hearing, plaintiff had completed kindergarten.

**Plaintiff's Testimony.** Kendra Ruby, M.K.R.'s mother, testified that M.K.R.'s asthma caused her to have difficulty playing with her friends, running and other activities. When it was very hot, she became short of breath with just a little activity.

M.K.R had asthma attacks requiring the use of her rescue inhaler at least once or twice a week. When she was ill, she is prescribed breathing treatments and a steroid. M.K.R. was placed on steroids two to three times a year.

M.K.R. weighed 114 pounds and was 49 ½ inches tall. She completed kindergarten but struggled with listening to her teachers and getting along with her classmates. Changes to her routine resulted in M.K.R. becoming very aggressive. She was kicked out of her Head Start program for throwing chairs and hitting other students and teachers. If Ms. Ruby asked M.K.R. to do something, she was defiant. Occasionally, M.K.R. would listen to her mother, but most of the time she would not.

M.K.R. was very easily distracted. If she was given directions with a few steps, she would need to have the directions constantly repeated and would require watching over to make sure she completed it correctly.

 In addition to changes in her routine, many things caused M.K.R. frustration because of her sensory issues. Her fine motor skills, which included cutting paper or writing, were okay, although she still needed a lot of work. Her mother had to supervise her to make sure that she did not hurt herself. She was not able to perform these activities at the same level as her peers.

Plaintiff had a couple of friends that have accepted her. Other classmates tormented and picked on her. M.K.R. got along with their family pets, although she smacked them when they get into stuff.

M.K.R. used a CPAP machine at night, but she did not always use it the entire night. Her doctor wanted her to use it for at least four hours. It bothered her, so she took it off.

M.K.R. had severe trouble with staying focused or sustaining her attention and concentration. She required constant reminders to stay on tasks, and she was distracted by the littlest thing, like a ceiling fan or the dog. Keeping her on task was overwhelming because M.K.R. got frustrated and combative.

M.K.R. was diagnosed with bilateral Achilles tendinitis. She received six physical therapy sessions, but the condition had not resolved. She did exercises at home. M.K.R.'s tendons in the back of her foot up through her leg were very tight, making it difficult for her to walk up and down steps. At times, she fell down. She complained of pain all the time. Her mother gave her warm baths and had her stretch. M.K.R. required some assistance with self-care. (R. 78-86.)

**Medical Evidence of Record.**  The administrative law judge's decision fairly sets out the relevant medical evidence of record.  This Report and Recommendation will only briefly summarize that evidence.

**Physical Impairments.**

<u>Coschocton County Memorial Hospital</u>. M.K.R. was treated on numerous occasions for complaints of asthma and upper respiratory problems in the emergency room. On February 7, 2006, she was treated for bronchitis and administered albuterol inhalers. (R. 701.) On March 5, 2006, she was treated for pneumonia. (R. 697.) On May 8,

2006, she was treated for congestion and cough. (R. 680.) On February 11, 2007, she was treated for shortness of breath. (R. 663.) Chest x-rays revealed mild perobronchial thickening related to bronchitis or reactive airway disease but no evidence of pneumonia. (R. 665.) On May 6, 2009, she was treated for hypertrophic tonsils and adenoids with snoring and evaluated for surgery. (R. 648.)

Akron Children's Hospital. M.K.R. was treated from March 2008 through June 2010 at Akron Children's Hospital for moderate and persistent asthma and obesity. (R. 248-65.)

On March 11, 2008, plaintiff's asthma was described as moderate, persistent with good control. (R. 264.) On September 2, 2008, M.K.R.'s mother expressed concerned about M.K.R.'s restless sleep. She was not having significant trouble with her asthma. She did not need to have tonsils taken out at this time. If her sleep did not improve, a polysomnogram could be considered. (R. 260-61.)

On April 28, 2009, M.K.R.'s mother expressed concern about M.K.R.'s weight gain. (R. 257.) Her asthma was described as moderate, persistent and well-controlled. Her medications were change to help address the weight gain.  (R. 258.) On September 23, 2009, M.K.R. was "doing ok." (R. 254.) On February 23, 2010, M.K.R. was experiencing an acute exacerbation and allergic rhinitis. (R. 252.) On June 22, 2010, the treatment note indicates that M.K.R. was not having many problems and did not require albuterol more than once or twice a week. (R. 248.) Plaintiff's asthma was described as moderate, persistent and well-controlled. (R. 249.)

In August 2010, M.K.R. underwent a tonsillectomy and adenoidectomy. (R. 266.)

On December 29, 2010, M.K.R. presented with worsening symptoms. She had been using albuterol almost every day for the past few months. Although oral corticosteroids have not been required, she had visited the emergency room. Her moderate, persistent asthma was described as poorly controlled. (R. 358-59.)

On January 27, 2011, M.K.R.'s asthma seemed a little better. She had difficulty falling asleep and waking up in the morning. Once she falls asleep, she was restless, but she stayed asleep. Her bed was in the living room, and the television was usually on. She had no consistent bedtime routine. The problems occurred daily and had gradually worsened. M.K.R. cried when she had to go to sleep. She had frequent leg movements, fussiness, restless sleep, daytime sleepiness, and unusual sleep positions. She had significant behavior problems at school. She had anger problems, which resulted in her hitting other kids, hitting the wall, and throwing temper tantrums. During the physical examination, M.K.R. refused to comply with the examination requests. Her mother needed to hold her down to have her ears examined and to pry her mouth open with her fingers. M.K.R. was kicking and crying during the examination, and her mother stated that she was 2-3 times worse when she tried to put her to sleep. It was recommended that M.K.R undergo a polysomnogram. She would likely need behavioral therapy and a referral for a sleep psychologist.  (R. 334-36.)

A May 6, 2011 polysomnography revealed mild obstructive sleep apena. There was mild primary snoring. Sleep efficiency was decreased at 67% due to sleep latency.

She had 100 arousals, resulting in an elevated arousal index. Nineteen of the arousals were associated with respiratory events, and eight were associated with periodic leg movements. The remaining arousals were spontaneous. Her periodic leg movement index was also elevated. Dr. Olmar, the interpreting physician, diagnosed obstructive sleep apnea; sleep disturbance, unspecified snoring; other organic sleep related movement disorders, periodic leg movements of sleep; and persistent disorder of initiating or maintaining sleep. (R. 344-46.)

On November 7, 2011, M.K.R. was diagnosed with bilateral Achilles tendinitis. She was referred to physical therapy. (R. 446-47.)

On July 15, 2011, Megan G. Maxwell, an occupational therapist, conducted an examination of M.K.R.  Ms. Maxwell noted that M.K.R. would benefit from occupational therapy services to address fine motor skills, visual motor skills and visual perceptual skills.  M.K.R. had definite differences in the areas of auditory processing, tactile processing, multisensory processing, and oral sensory processing. Difficulties in the areas means that a particular form of sensory input is either confusing, upsetting or not meaningful to the child. M.K.R. was sensitive to certain types of auditory input, and she did not respond to all types of auditory input. She was very sensitive to various types of tactile input. She frequently withdrew from splashing water and had difficulty standing close to others. Because of difficulties with multisensory processing, she had difficulty paying attention, particularly when there was competing sensory input in the environment. Differences with oral sensory processing caused her to be sensitive to the

7

sensory aspects of food. Ms. Maxwell opined that M.K.R. might have difficulty sitting for long periods of time, remaining alert, and maintaining participation with peers and anticipating how to move around safely resulting in clumsiness, incoordination, and frequent injuries. Ms. Maxwell also opined that M.K.R. would have difficulty with emotional and social responses and behavioral outcomes of sensory processing. (R. 449-53.)

Susan M. Merzweiler, M.D., F.A.A.P. Dr. Merzweiler, M.K.R.'s treating physician since birth, provided records from October 2005, through December 2010. (R. 272, 276-332.)

In a December 13, 2010 letter to the Bureau of Disability Determination, Dr. Merzweiler stated that M.K.R. had bronchitis at six months, which was followed by many reactive airway disease exacerbations. Before 12 months of age, she was started on inhaled cortico-steroids by a pulmonologist. She continued to experience frequent exacerbations up through and around 3 to 3½ years. Although she has had fewer visits to the emergency room, M.K.R. is treated by pulmonologist. (R. 272.)

Jeffrey S. Masin, M.D. Dr. Masin, an ear, nose and throat specialist, treated plaintiff for decreased hearing and reactive airway disease symptoms. On July 12, 2010, Dr. Masin recommended that M.K.R. have her tonsils and adenoids removed due to chronic sinusitis and upper respiratory problems. (R. 273.)

John L. Mormol, M.D. On December 13, 2010, Dr. Mormol, a State agency reviewing physician, reviewed the evidence of record and concluded that M.K.R.'s

asthma constituted a severe impairment and that her obesity was non-severe. Dr. Mormol found no limitations with respect to M.K.R.'s abilities to acquire and use information, to attend and complete tasks, to interact and relate with others, to move about and manipulate objects, and to care for herself. Her heath and physical well-being rating was marked. Dr. Mormol concluded that M.K.R. did not functionally equal a Listing and that she was not disabled. (R. 88-93.)

On reconsideration, the State agency reviewing physician and psychologist noted that plaintiff was diagnosed with asthma, obesity, ADHD, opposition defiant disorder and sleep-related breathing disorders. (R. 101.) M.K.R.'s limitations to acquire and use information, to attend and complete tasks, to interact and relate with others were less than marked. She had no limitations in her abilities to move about and manipulate objects and to care for herself. Her health and physical well-being was rated as less than marked. (101-05.)

**Psychological Impairments.**

T. Rodney Swearingen, Ph.D. On May 25, 2011, Dr. Swearingen, a psychologist, completed a psychological evaluation of M.K.R. to assess the presence and nature of any existing disability at the request of the Division of Disability Determination.

M.K.R.'s mother reported that M.K.R. had difficulty sleeping and significant anger problems. She had a history of hitting other children and throwing temper tantrums. Her mother's work schedule contributed to inconsistent sleep.

Plaintiff had attended a Head Start program and was scheduled to start kindergarten in the fall. M.K.R. did not do well in school because she was combative, aggressive, and did not listen. She was not placed in special education classes. She had some attendance problems because of her doctor appointments.

School records indicated that M.K.R. tended to misbehave when she did not get her way. She would kick, hit, engage in name calling, refuse to transition, and throw things. She tended to have one "big upset" per week with several small upsets occurring daily. She was unable to function independently and required assistance in making transitions. She was easily distracted and had difficulty following instructions. Her teachers noted the presence of fine motor skill impairments. M.K.R. had difficulty with writing and drawing.

On mental status examination, M.K.R. maintained good eye contact. Her facial gestural expressiveness was normal. Her affect was reactive with anxious qualities. Her mood was anxious. She was argumentative. Her appetite was described as good; her weight fluctuated. She had difficulty sleeping due to sleep apnea. She had crying spells. When she felt depressed, she talked about her self negatively. She hit herself in the head a lot. Her energy level was described as very high. She experienced mood swings, and her mother said that her mood never appeared normal. She experienced panic attacks. She was easily irritated and angry. She was afraid of the dark. She worried a lot about whether someone was her friend. M.K.R. was oriented in three spheres. She was able to repeat three digits forward but did not understand the backward digit span task.

Dr. Swearingen diagnosed attention deficit hyperactivity disorder, predominantly hyperactive-impulsive type and oppositional defiant disorder. He assigned a Global Assessment of Functioning ("GAF") score of 52. Dr. Swearingen concluded that M.K.R. had difficulty sustaining attention for prolonged periods of time. Dr. Swearingen expected that she would have significant impairment in a large group setting as she would likely interrupt peers with high levels of activity, distracting verbal and physical behaviors, and frequent movement about the classroom. Dr. Swearingen opined that M.K.R. was capable of being cooperative during one-on-one interactions, but not on a consistent basis. In a group setting, she would likely experience difficulty due to poor impulse control, behavioral problems, and a high level of distractibility when relating to others. M.K.R. could mostly complete self-care tasks independently, but she required some prompting to begin tasks and to ensure completion. (R. 416-20.)

Stephen Dean. Ph.D. On August 25, 2011, Dr. Dean, a psychologist, evaluated M.K.R. at the request of her treating physician to assess her emotional and behavioral functioning. M.K.R. had been removed from daycare for throwing chairs, beating her head on the wall, and her overall combative behavior. On mental status examination, M.K.R. was difficult to engage. She refused to cooperate and needed prompting from her mother. Ms. Ruby stated that typically her daughter's mood was good, but she would have "meltdowns" on a daily basis. She had non-stop energy. She had difficulty with attention and concentration. Her appetite was good. She denied difficulty sleeping,

although she was diagnosed with sleep apnea. According to her mother, M.K.R. was overly sensitive and became angry quickly and frequently. She was impulsive.

Dr. Dean believed that the results from intelligence testing were likely to be a conservative measure of her ability because she was somewhat oppositional during testing. Results suggested that M.K.R. had a limited understanding of words and struggled to express herself verbally. She had limited visual spatial skills and was concrete in her thinking. She was likely to have difficulty with learning and would learn more slowly than her peers. Results from the Child Behavior Checklist showed that her mother rated M.K.R. as having significant attention difficulty along with being hyperactive. She also believed that M.K.R. had depression and suffered from an anxiety disorder. She was very emotionally reactive and became upset easily. She had numerous somatic complaints and had significant difficulty sleeping. Ms. Ruby also perceived her daughter as being oppositional and defiant. (R. 471-73.)

Shelly R. Tompkins, M.Ed, LPCC-S, NCC. On June 23, 2011, Ms. Tompkins administered several preschool versions of the Behavior Rating Inventory of Executive Function (BRIEF-P). Ms. Tompkins noted difficulty in all aspects of executive functioning with concerns with her ability to inhibit impulsive responses, adjust to changes in routine or task demands, modulate emotions, sustain working memory and plan and organize problem solving approaches. (R. 476-81, 505-07.)

Thompkins Child & Adolescent Services, Inc. On June 29, 2011, M.K.R. was evaluated and diagnosed with disruptive behavior disorder, not otherwise specified

and rule out diagnoses of attention deficit hyperactivity disorder and sexual abuse of child, victim. (R. 544.) A treatment plan was developed to address M.K.R.'s need to learn to deal with anger appropriately. (R. 545-46.)

On February 22, 2012, the psychiatrist prescribed Clonidine and Vyvanse. (R. 586-89.) On March 17, 2012, her mother reported that M.K.R. was doing well. M.K.R. was doing a lot better in class. (R. 721-22.) On April 4, 2012, M.K.R. was reported to be doing better in school. (R. 719-20.)  On May 2, 2012, some improvement was noted. (R. 717-18.) On May 16, 2012, M.K.R. was described as doing well. She was improving on Abilify. (R. 715-16.) Treatment notes from June 13, 2012 indicate that although she was making progress, she was back to poor behaviors and outbursts. Her sleep was restless. (R. 713-14.) Treatment notes dated June 27, 2012 indicated that M.K.R.'s sleep and appetite were okay. She was continued on Clonidine, Vyvanse, and Abilify. The doctor noted that she was doing well and had had only a couple of spells. M.K.R. was noted to be making progress.  (R. 711-12.)

Deborah J. Corder. On February 29, 2012, Ms. Corder, M.K.R.'s kindergarten teacher at South Lawn Elementary School, completed a teacher questionnaire. With respect to acquiring and using information, Ms. Corder opined that M.K.R. had an obvious problem. She had a serious problem with reading and comprehending written material, comprehending and doing math problems, expressing ideas in written form and applying problem-solving skills in class discussions. She had an obvious problem comprehending oral instructions, understanding school and content vocabulary,

13

understanding and participating in class discussions, learning new material, recalling and applying previously learned material. She had a slight problem with providing organized oral explanations and adequate descriptions. (R. 223.)

Ms. Corder did not provide an overall rating for attending and completing tasks. She indicated that M.K.R had a serious problem with carrying out multi-step instructions, changing from one activity to another without being disruptive, completing work accurately without careless mistakes, and working without distracting others. She had an obvious problem focusing long enough to finish an assigned activity or task, refocusing to task when necessary, carrying out single-step instructions, and completing class/homework assignments. M.K.R. had a slight problem paying attention when spoken to directly, sustaining attention during play/sports activities, waiting to take turns, organizing own things or school materials, and working at reasonable pace/finishing on time. (R. 224.)

Ms. Corder did not provide an overall rating for interacting and relating with others. Ms. Corder noted that M.K.R. had a very serious problem with respecting/obeying adults in authority. She had a serious problem playing cooperatively with other children, making and keeping friends, seeking attention appropriately, expressing anger appropriately, and following rules (classroom, games, sports). She had an obvious problem asking permission appropriately, introducing and maintaining relevant and appropriate topics of conversation, and using adequate vocabulary and grammar to express thoughts/ideas in general and engage in everyday

14

conversation. She had a slight problem using language appropriate to the situation and listener and interpreting the meaning of facial expression, body language, hints and sarcasm. M.K.R. has problems with the activities listed above on a daily basis. Ms. Corder indicated that it has been necessary to implement behavior modification strategies for M.K.R., which include behavior strategies, removal from the classroom, and providing her extra space that is away from her peers. (R. 225.)

Ms. Corder did not provide an overall rating for moving about and manipulating objects. She noted that M.K.R. has an obvious problem moving her body from one place to another; moving and manipulating things; demonstrating strength, coordination, dexterity in activities or tasks; managing pace of physical activities or tasks; showing a sense of body's location and movement in space; integrating sensory input with motor output; and planning, remembering, executing controlled motor movements. (R. 226.)

Ms. Corder did not provide an overall rating for caring for herself. M.K.R. had a serious problem handling frustration appropriately, being patient when necessary, and responding appropriately to changes in mood. She had an obvious problem identifying and appropriately asserting emotional needs, using appropriate coping skills to meet daily demands of school environment, and knowing when ask to for help. She had no problem taking care of personal hygiene and caring for her physical needs. (R. 227.)

The only additional comment made by Ms. Corder indicated that she did not recommend "this child for disability benefits at this time." (R. 229.)

**Administrative Law Judge's Findings.**

1.     The claimant was born on October 13, 2005. Therefore, she was a preschooler on October 12, 2010, the date application was filed, and is currently a school-age child (20 CFR 416.926a(g)(2)).

2.     The claimant has not engaged in substantial gainful activity since October 12, 2010, the application date (20 CFR 416.924(b) and 416.971 *et seq.*)

3.     The claimant has the following severe impairments: asthma, obesity, attention deficit hyperactivity disorder (ADHD); Oppositional Defiant Disorder and sleep apena (20 CFR 416.924(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926).

5.     The claimant does not have an impairment or combination of impairments that functionally equals the severity of the listings (20 CFR 416.924(d) and 416.926a).

6.     The claimant has not been disabled, as defined in the Social Security Act, since October 12, 2010, the date the application was filed (20 CFR 416.924(a)).

(R. 21-34.)

**Standard of Review**.  Under the provisions of 42 U.S.C. §405(g), "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Company v. NLRB*, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'"  *Id.  LeMaster v. Weinberger*, 533 F.2d 337, 339 (6th Cir.

1976).  The Commissioner's findings of fact must be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Houston v. Secretary*, 736 F.2d 365, 366 (6th Cir. 1984); *Fraley v. Secretary*, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'"  *Beavers v. Secretary of Health, Education and Welfare*, 577 F.2d 383, 387 (6th Cir. 1978)(quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1950)); *Wages v. Secretary of Health and Human Services*, 755 F.2d 495, 497 (6th Cir. 1985).

**Plaintiff's Arguments.**   Plaintiff argues that the decision of the Commissioner denying benefits should be reversed because:

- The administrative law judge violated SSR 96-2p and 20 C.F.R. § 404.1527 when evaluating Dr. Merzweiler's opinion. Plaintiff maintains that the administrative law judge failed to properly evaluate the March 14, 2012 opinion of Dr. Merzweiler using the factors outline in 20 CFR § 404.1527 and failed to give good reason for the weight given to the opinion. Dr. Merzweiler has been M.K.R.'s primary treating physician since she was born. Despite the lengthy treatment relationship, the administrative law judge's explanation regarding the weight accorded her opinion was minimal. Plaintiff maintains that an adjudicator must adopt a treating source's medical opinion if the opinion comes from a medical source, it is a medical opinion, it is well supported by medically acceptable clinical and diagnostic techniques, and is

17

not inconsistent with other substantial evidence in the record. Even when a treating source is not entitled to controlling weight, such opinion may still be entitled to deference using the factors in 20 CFR § 404.1527.

- <u>The administrative law judge violated SSR 96-6p</u>. Plaintiff argues that the administrative law judge's decision violated Social Securing Ruling 96-6p by relying on the outdated December 2010 opinion of the non-examining state agency physician and the outdated May 2011 consultative psychological opinion, which were formulated prior to M.K.R. beginning mental health treatment. Since these opinions were provided, additional medical evidence has been included in the record, and the administrative law judge erred by relying on outdated opinions.

- <u>The administrative law judge failed to rule on plaintiff's requests for a medical expert</u>. Counsel for plaintiff requested that the administrative law judge obtain the testimony of a medical expert regarding the childhood psychological listings. Despite multiple requests for a medical expert, the administrative law judge failed to respond in any other way than a terse statement made at the August 2, 2012 hearing.

- <u>The administrative law judge failed to properly evaluate the childhood disability Listings</u>. Plaintiff argues that rather than relying on medical opinions, the administrative law judge improperly evaluated whether or not M.K.R. met or equaled the childhood disability listings or whether she

functionally equaled the listings. Plaintiff maintains that although an administrative law judge has discretion to determine whether or not a claimant meets a Listing, an administrative law judge does not possess the medical training needed to determine whether an individual's combined impairments equals a listed impairment.

**Analysis.**  Treating Doctor: Legal Standard.  A treating doctor's opinion[1] on the issue of disability is entitled to greater weight than that of a physician who has examined plaintiff on only one occasion or who has merely conducted a paper review of the medical evidence of record.  20 C.F.R. § 404.1527(d)(1).  *Hurst v. Schweiker*, 725 F.2d 53, 55 (6th Cir. 1984); *Lashley v. Secretary of Health and Human Services*, 708 F.2d 1048, 1054 (6th Cir. 1983).  The Commissioner's regulations explain that Social Security generally gives more weight to a treating doctors' opinions because treators are usually "most able to provide a detailed, longitudinal picture" of the claimant's medical

---

[1]The Commissioner's regulations define "medical opinions" as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 404.1527(a)(2). Treating sources often express more than one medical opinion, including "at least one diagnosis, a prognosis and an opinion about what the individual can still do." SSR 96-2p, 1996 WL 374188, at *2. When an administrative law judge fails to give a good reason for rejecting a treator's medical opinion, remand is required unless the failure does not ultimately affect the decision, *i.e.*, the error is *de minimis. Wilson*, 378 F.3d at 547. So reversible error is not committed where the treator's opinion "is patently deficient that the Commissioner could not possibly credit it;" the administrative law judge's findings credit the treator's opinion or makes findings consistent with it; or the decision meets the goal of 20 C.F.R. § 1527(d)(2) but does not technically meet all its requirements. *Id. See, Gayheart v. Commissioner of Social Security,* 710 F.3d 365, 380 (6th Cir. 2013).

impairments. 20 C.F.R. § 404.1527(d)(2). When the treating doctor's opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record" the Commissioner "will give it controlling weight. " *Id.*

Even though a claimant's treating physician may be expected to have a greater insight into his patient's condition than a one-time examining physician or a medical adviser, Congress specifically amended the Social Security Act in 1967 to provide that to be disabling an impairment must be "medically determinable." 42 U.S.C. §423(d)(1)(A). Consequently, a treating doctor's opinion does not bind the Commissioner when it is not supported by detailed clinical and diagnostic test evidence. *Warner v. Commissioner of Social Security,* 375 F.3d 387, 390 (6th Cir. 2004)*; Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 779-780 (6th Cir. 1987)*; King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1983); *Halsey v. Richardson*, 441 F.2d 1230, 1235-1236 (6th Cir. 1971); *Lafoon v. Califano*, 558 F.2d 253, 254-256 (5th Cir. 1975). 20 C.F.R. §§404.1513(b), (c), (d), 404.1526(b), and 404.1527(a)(1)[2].

---

[2]Section 404.157(a)(1) provides:
You can only be found disabled if you are unable to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. See §404.1505. Your impairment must result from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. See §404.1508.

The Commissioner's regulations provide that she will generally "give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you." 20 C.F.R. § 404.1527(d)(1). When a treating source's opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." 20 C.F.R. § 404.1527(d)(2).

When the treating source's opinion is well-supported by objective medical evidence and is not inconsistent with other substantial evidence, that ends the analysis. 20 C.F.R. § 404.1527(c)(2); Social Security Ruling 96-2p[3]. *Gayheart v. Commissioner of Social Security,* 710 F.3d 365, 375 (6th Cir. 2013). The Commissioner's regulations require decision-makers "to provide 'good reasons' for discounting the weight given to a treating-source opinion. [20 C.F.R.] § 404.1527(c)(2)."[4] *Gayheart,* 710 F.3d at 375.

The Commissioner has issued a policy statement, Social Security Ruling 92-6p, to guide decision-makers' assessment of treating-source opinion. It emphasizes:

1. A case cannot be decided in reliance on a medical opinion without some reasonable support for the opinion.

---

[3]Social Security Ruling 96-2p provides, in relevant part:

. . .

6. If a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight; *i.e.,* it must be adopted.

[4]Section 404.1527(c)(2) provides, in relevant part: "We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."

2. Controlling weight may be given only in appropriate circumstances to medical opinions, *i.e.*, opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources.

3. Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques.

4. Even if a treating source's medical opinion is well-supported, controlling weight may not be given to the opinion unless it also is "not inconsistent" with the other substantial evidence in the case record.

5. The judgment whether a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record requires an understanding of the clinical signs and laboratory findings and what they signify.

6. If a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight; *i.e.*, it must be adopted.

7. A finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected.  It may still be entitled to deference and be adopted by the adjudicator.

The focus at this step is solely on whether the treating-source opinion is well-supported by objective medical evidence and not inconsistent with other substantial evidence. In making this determination the factors for assessing the *weight* to give to the medical opinions of any medical source, 20 C.F.R. § 404.1527(c), are not used. These come into play only when there are good reasons not to give the treating-source opinion

controlling weight.  20 C.F.R. § 404.1527(c)(2)[5]; *Gayheart,* above,710 F.3d at 376, 2013 WL 896255, *10.

If there are good reasons to find that the treating-source opinion is not controlling, then the decision-maker turns to evaluating all the medical source evidence and determining what weight to assign to each source, including the treating sources[6]. The Commissioner's regulations require the decision-maker to considers the length of the relationship and frequency of examination; nature and extent of the treatment

_____

[5]Section 404.1527(c)(2) provides, in relevant part:
 If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. *When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(I) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion*

(Emphasis added.)

[6]Even when the treating source-opinion is not controlling, it may carry sufficient weight to be adopted by the Commissioner:
Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

SSR 96-2p.

relationship; how well-supported the opinion is by medical signs and laboratory findings; its consistency with the record as a whole; the treating source's specialization; the source's familiarity with the Social Security program and understanding of its evidentiary requirements; and the extent to which the source is familiar with other information in the case record relevant to decision.  20 C.F.R. § 404.1527(c)(1) through (6). Subject to these guidelines, the Commissioner is the one responsible for determining whether a claimant is disabled.  20 C.F.R. § 404.1527(e).

The case law is consistent with the principals set out in Social Security Ruling 96-2p.  A broad conclusory statement of a treating physician that his patient is disabled is not controlling.  *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984).  For the treating physician's opinion to have controlling weight it must have "sufficient data to support the diagnosis."  *Kirk v. Secretary of Health and Human Services*, 667 F.2d 524, 536, 538 (6th Cir. 1981); *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985).  The Commissioner may reject the treating doctor's opinions when "good reasons are identified for not accepting them."  *Hall v. Bowen*, 837 F.2d 272, 276 (6th Cir. 1988); *Wilson v. Commissioner of Social Security,* 378 F.3d 541, 544 (6th Cir. 2004). These reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Soc. Sec. Rul. No. 96-2p, 1996 WL 374188 at *5; *Rogers v. Commissioner of Social Security,* 486 F.3d 234, 242 (6th Cir. 2007). This procedural requirement "ensures that the ALJ applies the treating physician rule and

permits meaningful review of the ALJ's application of the rule." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).Moreover, the conflicting substantial evidence "must consist of more than the medical opinions of nontreating and nonexamining doctors." *Gayheart*, 710 at 377. Even when the Commissioner determines not to give a treator's opinion controlling weight, the decision-maker must evaluate the treator's opinion using the factors set out in 20 C.F.R. § 404.1527(d)(2). *Wilson*, 378 F.3d at 544; *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009). There remains a rebuttable presumption that the treating physician's opinion "is entitled to great deference." *Rogers v. Commissioner of Social Security*, 486 F.3d at 242; *Hensley*, above. The Commissioner makes the final decision on the ultimate issue of disability. *Warner v. Commissioner of Social Security*, 375 F.3d at 390; *Walker v. Secretary of Health & Human Services*, 980 F.2d 1066, 1070 (6th Cir. 1992); *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847, 855 (6th Cir. 1986); *Harris v. Heckler*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n.1 (11th Cir. 1982).

Treating Doctor: Discussion. The administrative law judge analyzed the opinion evidence as follows:

> The opinion assessed by Dr. Merzweiler in March 2012 that the claimant had "marked" limitations in her ability to function, is afforded little weight. As the doctor reported herself, she is "ill-equipped" (her language) to make such an assessment as she is not a qualified psychologist or psychiatrist. Progress notes do no support her findings but rather show significant improvement in the claimant's ADHD and ODD disorders with the addition of the medications Abilify and Vyvanse.

(R. 25.) After reviewing the findings of the State agency physicians and psychologist, the administrative law judge concluded that their assessments were consistent with and well-supported by the objective medical evidence. The administrative law judge accepted their opinions as an accurate representation of M.K.R.'s abilities.

The administrative law judge properly considered the fact that Dr. Merzweiler's area of expertise did not include M.K.R.'s behavioral limitations. Dr. Merzweiler also did not have the benefit of reviewing plaintiff's treatment records that showed the impact of Abilify and Vyvanse. Her mother reported that M.K.R. was doing much better in class. (R. 719-22.) Plaintiff continued to show improvement in May 2012.  (R. 715-18.) Despite some setbacks in early June, she was still described as  making progress. (R. 713-14.) By late June, the psychiatrist noted that M.K.R. was doing well, that she had only a couple of spells and continued to be making progress.  (R. 711-12.) Given that Dr. Merzweiler did not have the benefit of reviewing these treatment records in addition to her lack expertise in this area, the administrative law judge did not err in failing to accord her opinion concerning plaintiff's behavioral limitations any weight. Dr. Merzweiler herself acknowledged that she was not the most suitable person to provide such an opinion, and the administrative law judge properly disregarded it as a result. The administrative law judge gave "good reasons" for assigning her opinion little weight.

The administrative law judge properly considered the opinions of the State agency physicians and psychologists. It is the role of the administrative law judge to

weigh the medical evidence and resolve any conflicting medical opinions in the record. *Lane v. Secretary of Health and Human Services*, 895 F.2d 1413 (6th Cir. 1990) ("The ALJ has the responsibility to weigh the medical evidence if conflicting medical opinions have been presented.") Although additional evidence was introduced following the opinions of that reviewing physicians and psychologists, the administrative law judge considered the additional evidence in formulating his opinion. *See McGrew v. Comm's of Soc. Sec.* 343 F. App'x 26, 32 (6th Cir. 2009). Because the administrative law judge reviewed and considered all of the medical evidence in the record that was introduced after the State agency consultants issued their opinions, there was no error.

**Failure to obtain a medical expert.** The primary function of a medical expert is to explain medical terms and the findings in medical reports in more complex cases in terms that the administrative law judge, a who is not a medical professional, may understand. *See, Richardson v. Perales,* 402 U.S. 389, 408 (1972). The Commissioner's regulations provide that an administrative law judge "may also ask for and consider opinions from medical experts on the nature and severity of [the claimant's] impairment(s) and on whether [the] impairment(s) equals the requirements of any impairment listed in appendix 1 to this sub-part." 20 C.F.R. § 404.1527(f)(2)(iii). The Commissioner's operations manual indicates that it is within the administrative law judge's discretion whether to seek the assistance of a medical expert. HALLEX I-2-5-32 (September 28, 2005). "The primary reason an ALJ may obtain ME opinion is to gain information which will help him or her evaluate the medical evidence in a case, and

determine whether the claimant is disabled or blind." *Id.* The operations manual

indicates that an administrative law judge "may need to obtain an ME's opinion" in the

following circumstances:

- the ALJ is determining whether a claimant's impairment(s) meets a listed impairment(s);
- the ALJ is determining the usual dosage and effect of drugs and other forms of therapy;
- the ALJ is assessing a claimant's failure to follow prescribed treatment;
- the ALJ is determining the degree of severity of a claimant's physical or mental impairment;
- the ALJ has reasonable doubt about the adequacy of the medical record in a case, and believes that an ME may be able to suggest additional relevant evidence;
- the medical evidence is conflicting or confusing, and the ALJ believes an ME may be able to clarify and explain the evidence or help resolve a conflict;
- the significance of clinical or laboratory findings in the record is not clear, and the ALJ believes an ME may be able to explain the findings and assist the ALJ in assessing their clinical significance;
- the ALJ is determining the claimant's residual functional capacity, *e.g.*, the ALJ may ask the ME to explain or clarify the claimant's functional limitations and abilities as established by the medical evidence of record;
- the ALJ has a question about the etiology or course of a disease and how it may affect the claimant's ability to engage in work activities at pertinent points in time, *e.g.*, the ALJ may ask the ME to explain the nature of an impairment and identify any medically contraindicated activities; or
- the ALJ desires expert medical opinion regarding the onset of an impairment.

HALLEX I-2-5-34 (September 28, 2005). An administrative law judge's determination of

whether a medical expert is necessary is inherently a discretionary decision. *Nebra A.*

*Simpson v. Commissioner of Social Security,* 2009 WL 2628355 (6th Cir. August 27,

2009)(unreported) at *8. An administrative law judge abuses her discretion only when

the testimony of a medical expert is "required for the discharge of the ALJ's duty to conduct a full inquiry into the claimant's allegations.  *See* 20 C.F.R. § 416.1444." *Haywood v. Sullivan,* 888 F.2d 1463, 1467-68 (5th Cir. 1989).

Here, the administrative law judge did not abuse his discretion.  His decision included a thorough recitation of the evidence and provided a thorough, well-documented findings supporting the conclusion.

The administrative law judge also properly evaluated the childhood disability Listings. Plaintiff relies specifically on this portion of Hallex I-2-5-34:

> The ALJ must obtain an ME's opinion, either in testimony at a hearing or in responses to written interrogatories:
> . . .
> • When the ALJ is considering a finding that the claimant's impairment(s) medically equals a medical listing.

HALLEX I-2-5-34. According to plaintiff, this means that the administrative law judge was required to obtain the testimony of a medical expert. However, given the great deference afforded administrative law judges, plaintiff's interpretation appears misguided. An administrative law judge must consider whether a claimant meets or equals a medical listing in every case. If plaintiff is correct, rather than having discretion as to whether obtain testimony from a medical expert, an administrative law judge would be required to have a medical expert in each and every case. The plain language of the provision relied upon by plaintiff more likely requires the opinion of a medical expert in any case in which the administrative law judge makes a finding that a claimant's impairment equals a listing. A medical expert would need to determine

whether an impairment is the medically equivalent to a listed impairment. Without such an opinion, the administrative law judge would not be able to make such a finding.

Here, the administrative law judge did not "play doctor" and formulate his own medical opinion when he concluded that M.K.R. did not equal a Listing. An administrative law judge has not improperly assumed to the role of a medical expert when he evaluating the medical evidence in the record. *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 439 (6th Cir. 2010).

From a review of the record as a whole, I conclude that there is substantial evidence supporting the administrative law judge's decision denying benefits. Accordingly, it is **RECOMMENDED** that the decision of the Commissioner of Social Security be **AFFIRMED.**  It is **FURTHER RECOMMENDED** that plaintiff's motion for summary judgment be **DENIED** and that defendant's motion for summary judgment be **GRANTED.**

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties a motion for reconsideration by the Court, specifically designating this Report and Recommendation, and the part thereof in question, as well as the basis for objection thereto.  28 U.S.C. §636(b)(1)(B); Rule 72(b), Fed. R. Civ. P.

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District

Judge and waiver of the right to appeal the judgment of the District Court.  *Thomas v. Arn*, 474 U.S. 140, 150-52 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also, Small v. Secretary of Health and Human Services*, 892 F.2d 15, 16 (2d Cir. 1989).

 

 

 s/Mark R.  Abel       
United States Magistrate Judge